ELWIN E. McCOY *vs.* PAUL CATALDO *et al. d.b.a.*
ADMIRAL INN.
ELWIN E. McCOY *vs.* PAUL CATALDO *et al. d.b.a.*
ADMIRAL INN.

MARCH 2, 1960.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Frost, JJ.

FROST, J. These two petitions were heard together before the workmen's compensation commission. The first case, Equity No. 2728, is an original petition for compensation and medical expenses under general laws 1956, §28-35-12. The second case, Equity No. 2727, is a petition to exceed the medical maximum under §28-33-5. From a decree of the full commission in each case affirming the decree of the single commissioner granting each petition, the respondents have filed a claim of appeal to this court.

The final decree of the commission in the first case contained findings of fact to the effect that on February 1, 1956 petitioner had sustained injuries to his right knee and back arising out of and in the course of his employment with respondents; that subsequently he had suffered from other conditions resulting from such original injuries; and that as a result thereof and the conditions flowing therefrom, petitioner had become totally incapacitated for work and continued to remain so. The decree ordered respondents to pay petitioner total compensation at the rate of $25.20 per week from February 1, 1956 and all reasonable medical and hospital bills incurred by him, in accordance with the compensation act.

In the second case the final decree of the commission granted petitioner's motion to dismiss respondents' appeal from a decree of the single commissioner, and in paragraph 3 thereof ordered respondents, in compliance with the decree entered on May 15, 1958, to pay forthwith the charges of four doctors. In the first case respondents have filed fourteen reasons of appeal of which those numbered 6, 8, 10, 11, 12 and 13 were waived in this court while in the second case six reasons of appeal were filed.

To understand the questions raised, a brief statement of the facts is essential. The petitioner, who was fifty-nine

years old and married, had been employed as a maintenance man for ten months at the Admiral Inn in Cumberland in this state. On the morning of February 1, 1956, he reached the Inn about 6:30 o'clock and started to go to the basement to change his clothes. At the top of the stairs it was dark and he stumbled over an empty beer case and fell down the flight of stairs to the cement floor. He thought he hit his head. As he expressed it, he was "out" for about two minutes but experienced no pain until sometime later. He worked all that morning and around noon was told to go home because he complained of his right knee and back. He took a taxi from his home to Miriam Hospital where he was admitted by Dr. Stanley D. Simon. He complained that he had a lump on the back of his head and that his knee and back were sore. On March 1, 1956 while hospitalized he was operated on by Dr. Abraham Horvitz who tied up the veins in both the left and right groins.

On the Sunday preceding the operation petitioner suffered a heart attack at which time Dr. David Freedman attended him. Following the operation by Dr. Horvitz he remained in bed until March 21, 1956 when he was discharged. While at home petitioner did no work and spent most of his time lying down. Around the last of March he had what he termed a second heart attack and was again taken to Miriam Hospital, where he was treated by Dr. Henry Miller. He remained until sometime in May and while there stayed in bed. His whole right side was paralyzed and he lost his speech for eight or nine days. He eventually went home. While at home on May 29, 1956, when he started to get out of bed he fell to the floor. At this time his whole right side was again paralyzed. He was taken to Miriam Hospital for the third time where he remained until the middle of July. During this stay Dr. Maurice Silver operated upon the back of his neck. Since July 1956 petitioner appears to have been in the Miriam Hospital six times, on each occasion for a cerebral vascular

disorder. In the latter part of 1956 he became a patient in the Veterans Administration Hospital in Providence for a like condition.

It also appeared in evidence that on November 22, 1950, petitioner, while employed by the Reuben H. Donnelly Corporation, slipped on a pencil while going upstairs and fell injuring his left knee. His disability continued until 1954. On December 23, 1950 he was examined by Dr. Robert G. Murphy to whom he stated that while sitting at home on December 13, 1950 he had sudden pain and loss of power in his left leg; that for five days there was no power in the leg; that thereafter his strength gradually returned; and that at the time of the examination he was able to walk on the leg.

Regarding this incident Dr. Murphy stated in his written report, "It seems to be quite obvious that this claimant had a left hemiplegia, which occurred about three weeks after an injury to his left knee. This was most probably due to a cerebral thrombosis. The condition is improving rapidly, and the only residuals at the time of the examination were weakness of the left leg and left face. I do not believe that the cerebral thrombosis was due to the injury, as there was a three-week interval between the time of the injury and the cerebral thrombosis." Doctor Murphy deceased before he was able to testify but his report was made an exhibit in the case.

There was a great deal of testimony by six doctors together with voluminous reports covering petitioner's many periods of hospitalization. From such evidence there emerges one all-embracing and important question: Were the cerebral vascular disturbances suffered by petitioner attributable to or caused by the accident of February 1, 1956?

There appears to be no question but that petitioner while in the employ of the respondents on February 1, 1956 suffered a compensable injury to the right knee and that there was an operation by Dr. Horvitz on the groins which re-

sulted directly from such injury. There was no evidence of injury to the back. On the question of causation it is necessary to consider in some detail the testimony of the doctors.

Doctor Stanley D. Simon, an orthopedic surgeon who saw petitioner on his admission to the hospital, testified that there was no evidence of fracture of the back nor of injury to the right knee. Later he stated that he thought petitioner had a thrombophlebitis of the vein of the inner aspect of the right knee. He testified that there was a natural sequence of events from his original admission down to the time of trial in April 1957. He declined, however, to express an opinion as to whether petitioner's condition at that time was caused by the accident of February 1, 1956.

Doctor Miller testified that he had been in practice ten years; that he formerly was an internist; that he was on the staff of Rhode Island Hospital and a cardiologist consultant at the Veterans Administration Hospital; and that he was an associate in medicine at Miriam Hospital. It would seem from his testimony that he was more constantly in touch with petitioner during the latter's many visits at Miriam Hospital than any other doctor. On April 12, 1957 Dr. Miller testified in answer to counsel's question as to what he had found wrong with petitioner, "Well, I know he had a phlebitis of the legs. It was my impression he had multiple pulmonary emboli. I believe he has had two cerebral thromboses, one on the right side, and one on the left side. I believe that he probably had a—I put a question mark—arteriosclerotic heart disease, and I think he is an extremely nervous individual." A little later counsel asked: "Doctor, from the history that has been given to you, from the observations that you have made of the patient, from the examinations that you have made of the patient, have you an opinion as to what is the cause of the patient's condition?" The doctor replied, "My opinion is this man had an injury to his leg, which directly resulted

in a phlebitis, directly resulted in a pulmonary emboli, and indirectly resulted in a cerebral thrombosis."

On May 1, 1957 in answer to a question in cross-examination as to what was disabling him then, the doctor replied, "I believe it's the changes that have occurred in the brain as a result of his two cerebral thromboses." He also stated that he was "pretty sure" petitioner had severe coronary disease or coronary artery disease, and that he had arteriosclerotic disease. The doctor also testified, referring to the trauma of February 1, 1956, "The trauma could have resulted in the train of findings, train of events that happened to Mr. McCoy." He further testified, "Q. And is it your opinion that it did? A. It is my opinion that that is what happened. It is probable that is what happened. Q. Probable that is what happened, isn't it, Doctor? A. Yes."

Doctor Silver, a neurosurgeon, testified that he saw petitioner in the hospital on June 5 or 6, 1956; that he made a diagnosis of right hemiparesis with aphasia, possibly due to occlusion or vascular insufficiency of the left carotid circulation; that he later performed a cerebral angiography; and that he found an apparent obstruction of the internal carotid artery in the neck. On May 22, 1957 he stated it was his opinion that petitioner's hospitalizations and treatments were a result of the initial injury of February 1, 1956.

On August 20, 1957 Dr. Hannibal Hamlin, a neurosurgeon, testified that in his opinion there was no causal connection between the fall on February 1, 1956 and a cerebral thrombosis which occurred on April 18, 1956; and that "an embolus from the site of thrombophlebitis in a lower extremity could not get to the brain and cause a thrombosis in this instance." He stated further that in his opinion the thrombosis occurred as a spontaneous event caused by intrinsic disease of the arteries of the brain. Later he testified that the cerebral events were spontaneous and were separate events, all occasioned or caused by the same con-

dition, namely, disease of the blood vessels of the brain. Still later, in reply to a question by petitioner's counsel as to what part, if any, the arteriosclerotic conditions of petitioner played in the subsequent cerebral thromboses that he had, the doctor replied, "In my opinion it was the cause of them—arteriosclerosis of his cerebral blood vessels, his arteries."

On August 28, 1957 Dr. John A. Dillon an internist, who had previously been appointed an impartial examiner to examine petitioner for the purpose of determining whether he was physically able to testify, stated that he examined him on January 21, 1957 and as a result thereof he found that petitioner was in excellent mental condition and was able to have his deposition taken at the hospital. He testified that in his opinion there was no causal relation between the fall which occurred on February 1, 1956 and the cerebral accident of April 1, 1956. He further stated, "I feel that probably the injury and the fall and the first hospitalization had a bad effect, and had something to do with the pathological conditions that occurred later"; and a few minutes later he said, "I feel that after this man had the thrombophlebitis and the pulmonary emboli, the subsequent diagnoses of cerebral thrombosis and arteriosclerotic heart disease are not related as diseases to the admitting diseases."

The commissioner heard the testimony at various intervals over a period of a year and four months. The doctors who testified for petitioner attended him for longer or shorter periods. Of the doctors who testified for respondents, Dr. Hamlin did not attend petitioner at any time, but he had the opportunity of reading the many hospital reports before testifying. Doctor Dillon did not attend petitioner as a physician, but he saw and conversed with him prior to making his report to the commissioner that petitioner was able to give his deposition at the Miriam Hospital. He too had the opportunity of reading the hospital reports.

Doctor Murphy did not live to testify but his report was in evidence.

The witnesses were examined with much skill and at great length by the attorneys for the parties and the question at issue was clear, namely, whether the accident of February 1, 1956 was the cause of the later incidents which hospitalized petitioner and prevented him from working. After a careful consideration of the evidence, we are of the opinion that the case is one on which there could well be divergent views. Likewise the full commission could find upon the evidence that the decree of the single commissioner was supported by sufficient legal evidence. This court has made it clear in *Brown & Sharpe Mfg. Co.* v. *Lavoie,* 83 R. I. 335, that under the controlling statute, G. L. 1956, §28-35-30, we cannot weigh the evidence. As we stated in that case, the decree of the commission, being based upon some legal evidence, cannot be disturbed. See also *Jillson* v. *Ross,* 38 R. I. 145; *Emma* v. *A. D. Juilliard & Co.,* 75 R. I. 94; *Capasso* v. *Firesafe Builders Products Corp.,* 74 R. I. 458. Reasons of appeal numbered 1, 2, 3, 4, 5, 7, 9 and 14 in the first case are overruled.

In the second case a petition was filed with the workmen's compensation commission seeking permission to exceed the medical maximum. General laws 1956, §28-33-5. The petition was heard and granted by a single commissioner and the question of the reasonableness of the bills of four doctors was referred to the medical advisory committee, §28-33-7. This committee approved the commissioner's decision as to the reasonableness of the bills submitted by said doctors, and on May 15, 1958 a decree was entered wherein the commissioner found that the amount stipulated under the compensation act was not sufficient in the instant case to cover all the necessary and prolonged services rendered to petitioner by the four named doctors. He therefore fixed certain amounts as reasonable and ordered that the charges as set forth be paid.

The respondents appealed from this decree to the full commission on the ground among others that there was no legal evidence to support the finding that the charges specified were reasonable. Thereafter petitioner filed a motion with the workmen's compensation commission to dismiss the appeal on the ground that no appeal lies from the commissioner's finding on the necessity for additional charges or on the reasonableness thereof. This motion was granted and a decree was entered thereon on September 8, 1958. From such decree respondents claimed an appeal to this court. A motion by petitioner to dismiss the appeal was thereafter filed on the ground that an appeal to this court does not lie from a final decree of the workmen's compensation commission on the question of extending the amounts stipulated in §28-33-5 or on the reasonableness of medical charges, §28-33-7. This motion was heard and denied, *McCoy* v. *Cataldo*, 88 R. I. 330, 148 A.2d 267.

Prior to the hearing on such motion, there was filed in this court a stipulation, signed by counsel for each side, to the effect that all medical expenses mentioned in paragraph 3 of the decree theretofore entered on petitioner's petition to exceed the medical maximum had been paid in accordance with the decree as affirmed by the full commission.

In the case just cited we stated that findings of fact not supported by legal evidence amount to errors of law and would be reviewed by this court on appeal. It was therefore error for the full commission to dismiss respondents' appeal from the decision of the single commissioner without determining whether there was sufficient legal evidence to support his finding.

In the first case, Equity No. 2728, the respondents' appeal is denied and dismissed and the decree appealed from is affirmed. In the second case, Equity No. 2727, the re-

spondents' appeal is sustained and the decree appealed from is reversed. Each cause is remanded to the workmen's compensation commission for further proceedings.

*Dick & Carty, Joseph B. Carty,* for petitioner.

*Boss, Conlan, Keenan, Bulman & Rice, John T. Keenan,* for respondents.